UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FRANK RICCI, et al.,           :
    Plaintiffs,            :
                           :
v.                             :        Civil No. 3:04cv1109 (JBA)
                           :
JOHN DESTEFANO, et al.,        :
    Defendants.            :

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
[DOCS. ## 52, 60]

    In March 2004 the New Haven Civil Service Board ("CSB") refused to certify the results of two promotional exams for the positions of Lieutenant and Captain in the New Haven Fire Department.  This lawsuit arises from the circumstances leading to that decision and its consequences.

    Plaintiffs are seventeen white candidates and one Hispanic candidate who took the promotional exams, on which they fared very well, but received no promotion because without the CSB's certification of the test results, the promotional process could not proceed.  Defendants are the City of New Haven, Mayor John DeStefano, Chief Administrative Officer Karen Dubois-Walton, Corporation Counsel Thomas Ude, Director of Personnel Tina Burgett, and the two members of the CSB, Malcolm Weber and Zelma Tirado, who voted against certification.  Plaintiffs assert that defendants' actions in voting or arguing against certification of the examination results violated their rights under Title VII of

1

the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>, the Equal Protection Clause, the First Amendment, and 42 U.S.C. § 1985; plaintiffs also allege a common law claim of intentional infliction of emotional distress.  The parties have cross-moved for summary judgment on the Title VII and Equal Protection claims, and defendants additionally move for summary judgment on plaintiffs' other claims.

For the reasons that follow, defendants' motion for summary judgment [Doc. # 52] will be granted as to plaintiffs' federal claims; plaintiffs' cross-motion for summary judgment [Doc. # 60] will be denied; and the Court will decline jurisdiction over plaintiffs' state law claim.[1]

I.   **Factual Background**

While the parties strenuously dispute the relevance and legal import of, and inferences to be drawn from, many aspects of this case, the underlying facts are largely undisputed.  In November and December 2003, the New Haven Fire Department administered written and oral examinations for promotion to Lieutenant and Captain.  The City's Department of Human Resources issued a Request for Proposal for these examinations, as a result of which I/O Solutions ("IOS"), a seven-year-old Illinois company that specializes in entry-level and promotional examinations for

---

[1]Defendants also moved to strike portions of plaintiffs' Local Rule 56(a)2 Statement, which motion was denied.  <u>See</u> Ruling Denying Motion to Strike [Doc. # 130].

public safety (police and fire) departments, designed the
examinations.  Pl. Ex. IV(C) at 8.  Under the contract between
the City and the New Haven firefighters' union, the written exam
result counted for 60% of an applicant's score and the oral exam
for 40%.  Those with a total score above 70% on the exam would
pass.

Forty-one applicants took the Captain exam, of whom 25 were
white, 8 black, and 8 Hispanic.  Twenty-two of those applicants
passed, of whom 16 were white, 3 black, and 3 Hispanic.  Pl. Ex.
Vol. I, at 43.  Given that there were 7 Captain vacancies in the
department when the tests were administered, and that the "Rule
of Three" in the City Charter mandates that a civil service
position be filled from among the three individuals with the
highest scores on the exam, it appeared at that time that no
blacks and at most two Hispanics would be eligible for promotion,
as the top 9 scorers included 7 whites and 2 Hispanics.[2]

Seventy-seven applicants took the Lieutenant exam, of whom
43 were white, 19 black, and 15 Hispanic.  Thirty-four passed, of
whom 25 were white, 6 black and 3 Hispanic.  Id.  There were 8
vacancies, but because all of the top 10 scorers were white, it
appeared that no blacks or Hispanics would be promoted.[3]

_____

[2]Hispanics ranked 7, 8 and 13; blacks ranked 16, 19 and 22.
Pl. Ex. Vol. I, at 43.

[3]Hispanics ranked 27, 28 and 31; blacks ranked 14, 15, 16,
20, 22, and 24.  Pl. Ex. Vol. I, 43.

Certified promotional lists remain valid for two years.

The CSB held five hearings between January and March 2004 on the issue of whether to certify the test results.  The issue appears to have been raised by New Haven's Corporation Counsel, Thomas Ude.  At the initial hearing on January 22, 2004, Mr. Ude characterized the exam results as "a very significant disparate impact . . . that caused us to think this was something we should bring to you, the Civil Service Board, to evaluate and to be part of and to ultimately make a decision about the process."  Pl. Ex. Vol. IV(A) at 32.  While it is disputed whether Mr. Ude already had made up his mind to advise the CSB against certifying the results, his comments "emphasize[d] . . . that the case law does not require that the City find that the test is indefensible in order to take action that it believes is appropriate to remedy . . . disparate impact from examination."  Id. at 34-35.  He advised that "federal law does not require that you [the CSB] make a finding that this test . . . was not job-related, which is another way of saying it wasn't fair.  A test can be job-related and have a disparate impact on an ethnic group and still be rejected because there are less discriminatory alternatives for the selection process."  Id. at 36.

During the hearings, the tests results were not released by name, and therefore none of the firefighters knew where they had placed.  The only information provided to the CSB and the public,

including plaintiffs, was the scores by race and gender.
Nonetheless, several firefighters, although they did not know
where they had placed, spoke in favor of certifying the results.
Plaintiff Frank Ricci stated that the questions on the test were
drawn from "nationally recognized" books and New Haven's own
Rules and Regulations and Standard Operating Procedures.  Pl. Ex.
Vol. IV(A) at 88.  He stated that he "studied 8 to 13 hours a day
to prepare for this test and incurred over $1,000 in funds [sic]
to study for this test," including purchasing the books and
paying an acquaintance to read them on tape because he is
dyslexic and learns better by listening.  Other firefighters, who
believed the tests were fair, also spoke in support of the
certifying the results.  See, e.g., Testimony of Michael
Blatchley, id. at 75 ("[N]one of those questions were not in that
study material.  Every one of those questions came from the
material.").

    During the first hearing, the CSB also took statements from
several New Haven firefighters who complained that some of the
questions were not relevant to knowledge or skills necessary for
the positions (see, e.g., Statement of James Watson, id. at 85
("I think this test was unfair.  We don't use a lot of things
that were on that test" such as whether to park a firetruck
facing "uptown" or "downtown")), or that the study materials were
difficult to obtain (see Testimony of Gary Kinney, id. at 77

("The only books that most of us had in front of us in the fire
houses were Essentials of Fire Fighting. . . . [T]hese books [on
the syllabus] were never in the fire houses.")).

At the second hearing on February 5, Patrick Egan, president
of the firefighters' union, urged the CSB to conduct a validation
study to determine the job-relatedness of the test, referring
generally, although not by name, to the EEOC's "Uniform
Guidelines of Employee Selection Procedures."  Pl. Ex. Vol. IV(B)
at 11-12.  Plaintiffs' counsel in the present case also spoke and
urged certification.

On the other side, Donald Day, a representative of the
Northeast Region of the International Association of Black
Professional Firefighters, argued against certification, stating
that previous promotional examinations in 1996 and 1999 had black
and Latino firefighters ranked sufficiently high to have a
realistic opportunity for promotion, whereas "there was something
inherently wrong with this test" because minorities did not score
as highly.  Id. at 33-34.  He suggested that the CSB speak with
the director of the civil service in Bridgeport "to find out what
Bridgeport is doing different [sic] than New Haven," as they have
more diversity in their firefighter ranks.  Id. at 35.  In
particular, he stated that Bridgeport had "changed the relative
weights" among the portions of the exam, such that the written
test counts for 30% of the total score, the oral test for 65%,

6

and seniority 5%.  Id. at 36-37.  Ronald Mackey, the Internal
Affairs Officer for the Northeast Region of the International
Association of Black Professional Firefighters, supported Patrick
Egan's suggestion of obtaining a validation study, and also
suggested that New Haven could "adjust the test" as Bridgeport
had done, in order to "meet the criteria of having a certain
amount of minorities get elevated to the rank of Lieutenant and
Captain."  Id. at 43-45.

On February 11, 2004, the CSB heard from Chad Legel, Vice
President of IOS, who was the "project manager" in charge of
developing the exams at issue.  He stated that IOS had prepared
"both an entry-level exam and a physical ability test for the
firefighter position" in New Haven, but had not previously
prepared a New Haven promotional exam.  Id. at 10.  However, in
recent years his company had worked with similarly-sized public
safety departments with demographics similar to New Haven,
including Lansing, Michigan, Orange County, Florida, and the
North Miami Police Department, among others.  Id. at 9.

Legel described the way in which the test was developed.
First, the company interviewed a random sample of current New
Haven Fire Department Lieutenants, Captains and Battalion Chiefs
to determine basic information concerning the structure of the
department, the tasks required of individuals at each rank, and
the materials the department generally utilizes for training.

Based on the interviews, IOS developed a written job analysis questionnaire ("JAQ") that asked all incumbents in the positions of Lieutenant and Captain "to provide information about how important they feel a specific task, knowledge area, skill or ability is. . . ." Id. at 17.  The JAQ asked how important each task was to successful performance on the job and how frequently it was necessary to perform it.  Importance and frequency were merged into a metric called "criticality or essentiality."  Id. at 19.  Tasks above a certain criticality threshold were designated for testing on the written and oral portions of the exam.  In response to the question of whether he has generally found a difference between information tested in various departments "based on the racial content of the city and the force," Legel stated, "definitely no."  Id. at 21.  The one difference among the New Haven firefighters of similar rank that Legel noted was different levels of training in certain specialized fields such as hazardous materials; such variation "throws up a red flag" indicating that IOS should not ask "high-level questions about hazardous materials. . . ."  Id. at 22.

    Legal further stated that all the questions were firmly rooted in the study materials on the syllabus, which was distributed with the promotion applications.  See Def. Ex. 16 ("Written Examination Reference List").  Once the test was completed, an "independent reviewer," a Battalion Chief from the

Cobb County, Georgia, Fire Department, "reviewed the written exam for content and fidelity to the source material."  Pl. Ex. Vol. IV(B) at 24-25.  Another independent reviewer, a retired Fire Chief from outside Connecticut, reviewed the oral exam questions. Id. at 26.  IOS refrained from utilizing reviewers from Connecticut because the RFP had specified that examiners must come from outside Connecticut, due to concerns that utilizing internal personnel could potentially facilitate cheating on the test.

Likewise, IOS selected the panelists for the oral examination panels from departments outside Connecticut, making an effort "to gain maximum diversity."  Id. at 32.  All but one panel had one African-American, one Hispanic and one white assessor, and a standby panel had two African-Americans and one white.  Id.  The assessors were trained on how to grade the oral exam scenarios consistently, utilizing checklists of desired criteria.  Each panelist also held at least an equal rank (if not superior) to the position being tested, in order to be able to identify an answer that was good but not quite the best answer outlined in the checklist.  Id. at 33-34, 37.

Legel concluded by "implor[ing] anyone that had . . . concerns [about disparate impact] to review the content of the exam.  In my professional opinion, it's facially neutral." Id. at 49.

9

Noelia Marcano, Chief Examiner for the City of New Haven and Secretary to the CSB, explained the process by which the RFP was developed and IOS chosen.  She further explained that the job applications for the Lieutenant and Captain positions contained a job description, employment application, and "the actual study list in final form," and that when questions arose concerning conflicting information in some of the study books, IOS sent a letter to all applicants that they would not be asked questions on material where the sources differed.  Id. at 78.

At the next hearing on March 11, 2004, the CSB heard from Christopher Hornick, Ph.D., an industrial/organizational psychologist from Texas who runs a consulting business in competition with IOS.[4]  See Pl. Ex. Vol. IV(D) at 7, 12.  Dr. Hornick stated that he had "not had time to study the test at length or in detail."  Id. at 13.  However, he reviewed statistics provided by the City and concluded that "we're seeing relatively high adverse impact" from the IOS tests.  Id. at 11. He opined that his company finds "significantly and dramatically less adverse impact in most of the test procedures that we

---

[4]Plaintiffs argue that Dr. Hornick's non-sworn, hearsay statement at the CSB hearing is inadmissible as non-disclosed expert evidence.  Plaintiffs' argument is rejected because defendants proffer Dr. Hornick's not for the truth of his conclusion that the tests had a racially disparate impact, but to show that defendants had a good faith belief, based in part on Dr. Hornick's testimony, that such a disparate impact existed and justified the decision not to certify the exams.

design." Id. at 12.  He stated:

> Normally, whites outperform ethnic minorities on the
> majority of standardized testing procedures.  That is,
> in fact, the case with the data that we've seen in New
> Haven.
>
> I'm a little surprised at how much adverse impact there
> is in these tests.  And I hope at some point here we'll
> be talking in detail about that.  But my conclusion is
> that we did have significant adverse impact.  Some of
> it is fairly typical of what we've seen in other areas
> of the countries (sic) and other tests that people have
> developed.  But in other ways it is somewhat worse than
> what we're typically seeing in the profession practiced
> by others.

Id. at 11-12.  Dr. Hornick acknowledged that he had not looked at

specific statistics from previous promotional examinations in New

Haven to compare their results with the 2003 exam results.  Id.

at 14.

     When asked about the reasons behind any possible disparate

impact, Dr. Hornick answered, "I'm not sure that I can explain

it," but suggested that perhaps the 60%/40% breakdown mandated by

the collective bargaining agreement could be responsible, and

further suggested that there were "perhaps different types of

testing procedures that are much more valid in terms of

identifying the best potential supervisors in your fire

department."  Id. at 15.  He stated that based on his interviews

with firefighters, "we know that" a written test is "not as valid

as other procedures that exist."  Id. at 16.  He also suggested

that "[b]y not having anyone from within the department review

the items [on the test] you inevitably get things in there" that

are not relevant to the specific department.  Id. at 17-18.
Finally, Dr. Hornick identified as an alternative to traditional
written and oral testing processes "an assessment center process,
which is essentially an opportunity for candidates to demonstrate
their knowledge of the . . . standard operating procedures, to
demonstrate how they would address a particular problem as
opposed to just verbally saying it or identifying the correct
option on a written test.  For example, there's concepts of
situation judgment tests that can be developed and designed,
customized within organizations that demonstrate dramatically
less adverse impacts. . . ."  Id. at 22-23.

     At the same hearing, Vincent M. Lewis, a Fire Program
Specialist for the U.S. Department of Homeland Security, and a
retired career firefighter from Michigan, testified that he
believed the test was appropriate.  He stated that he had looked
"extensively at the Lieutenant's exam and a little less at the
Captain's exam," and believed that the candidates "should know
that material."  Id. at 34-35.  His one comment was that "a
number of questions in the Lieutenant's exam dealt with issues
that an apparatus driver needed to know," and a candidate who had
not had such training would be disadvantaged on those questions.
Id. at 34, 41.  However, he generally "felt the questions were
relevant for both exams," and believed that the New Haven
applicants were advantaged over examinees in other locations

because they were instructed exactly which chapters from the study materials would be on the tests.  Id. at 36.  He stated that he would not have changed anything about the way in which the tests were developed, and opined that any disparate impact could be due to a general pattern that "usually whites outperform some of the minorities on testing," or that "more whites . . . take the exam."  Id. at 37-38.

The last expert witness was Dr. Janet Helms, a professor of counseling psychology and the Director of the Institute for the Study and Promotion of Race and Culture at Boston College.  Her area of expertise "is not with firefighters per se but is more in the general area of how race and culture influence test performance more generally."  Id. at 43.  She did not examine the specific tests at issue.  Id. at 55.  However, she offered several potential explanations for racially disparate impact on the tests.  First, "[w]e know for a fact that regardless of what kind of written test we give in this country that we can just about predict how many people will pass who are members of under-represented groups.  And your data are not that inconsistent with what predictions would say were the case."  Id. at 44 (emphasis supplied).  Second, Dr. Helms suggested that because 67% of the respondents in the JAQ survey were white, the questions may have been skewed toward their job knowledge, as "most of the literature on firefighters show that the different

13

[racial and gender] groups perform the job differently." <u>Id.</u> at 46.  Relying on information she had read in newspaper accounts of the situation in New Haven, she stated that the difference in performance may have been due to differences in opportunities for training and "informal mentoring" available to minorities.  <u>Id.</u> at 48.  With respect to the oral exam, Dr. Helms suggested that people who are bilingual or "speak accented speech" may elicit more negative reactions from evaluators.  <u>Id.</u> at 49-50.  As general concerns, Dr. Helms mentioned that test takers may score lower if they are expected not to perform well, or if tests focus on "traditional ways of doing the job and the test-taker, in fact, uses innovative approaches." <u>Id.</u> at 51.  Additionally, she suggested that "removing" "socioeconomic status" from test scores "reduces the disparate impact to some extent." <u>Id.</u> at 57.

At the final hearing on March 18, 2004, defendant Ude, the Corporation Counsel, strongly advocated against certifying the exam results.  He concluded: "You have a choice.  It is my opinion that promotions under our rules as a result of these tests would not be consistent with federal law, would not be consistent with the purposes of our Civil Service Rules or our Charter, nor is it in the best interests of the firefighters and Lieutenants who took the exams."  Pl. Ex. Vol. IV(E) at 15-16. As a primary reason not to certify the results, Ude argued that the "results of previous exams in this department and in other

14

departments have not had this kind of a result, which is one of the reasons why these results were so startling when they came down.  These results were different." <u>Id.</u> at 19.  He argued that Dr. Hornick's statements to the CSB, standing alone, were "sufficient" reason not to certify, and advised the board "that it is the employer's burden to justify the use of the examination" if a Title VII suit were brought.  <u>Id.</u> at 21.

Defendant Walton spoke "on behalf of the Mayor" and also advocated discarding the test results, primarily because the eligibility list, when combined with the Rule of Three and the number of vacancies then available, would "create a situation in which African-Americans are excluded from promotional opportunity on both the Captain and Lieutenant positions and Latinos are excluded from promotional opportunity on the Lieutenant examination." <u>Id.</u> at 30.  She questioned whether there were "other ways of making the selection," that would be less "discriminatory." <u>Id.</u> at 31-32.

The board split two to two[5] on the question of certifying each exam, <u>see id.</u> at 70-73, as a result of which the promotional lists were not certified.

Plaintiffs allege that the non-certification vote was due to

---

[5]The fifth member of the CSB, Barbara Tinney Jennings, was recused because her brother, Lt. Gary Tinney, was a candidate for promotion on the Captain's examination.  She did not attend the hearings concerning these promotional exams.

political pressure, particularly by defendant Rev. Boise Kimber,
a vocal African-American minister who, it is acknowledged by all
parties, is a political supporter and vote-getter for Mayor
DeStefano.  Plaintiffs' theory is that the defendants urged the
CSB not to certify the results in the interest of pleasing
minority voters and other constituents in New Haven whose
priority was increasing racial diversity in the ranks of the Fire
Department.  Plaintiffs further argue that this pattern of
political manipulation is in keeping with prior actions by the
City of New Haven disregarding the Charter-mandated Rule of Three
in promotional decisions in the City's police and fire
departments.  In support of this argument, plaintiffs proffer
evidence regarding prior litigation in the Connecticut Superior
and Appellate Court, the substance and outcome of which is
largely admitted by defendants,[6] and which resulted in sharp
rebukes against the City for violating the civil service rules.
See Pl. L.R. 56(a)1 Stmt. ¶¶ 64-90; Def. Am. L.R. 56(a)2 Stmt. ¶¶
64-90.  Plaintiffs argue that the apparent racial disparity in
the results of the Lieutenant and Captain exams was due to the
fact that hiring into, and promotion within, the Fire Department
historically has been based on political patronage and promotion

---

[6]Defendants challenge the relevance of this evidence;
however, as the Court held in its ruling on defendants' motion to
strike, such evidence is relevant as background information to
the present case.

of racial diversity rather than merit; and they argue that the
higher-scoring firefighters simply studied harder.  In addition,
they argue that the evident disparity was not appreciably worse
on the 2003 examinations than other past promotional
examinations.

Defendants argue that "the decision not to certify [the
test] results was mandated by anti-discrimination federal, state
and local laws."  Def. Mem. in Support of Mot. for Summary
Judgment [Doc. # 52] at 4.  Alternatively, they argue that they
had a good faith belief that Title VII mandated non-certification
of the examinations, and they cannot be liable under Title VII
for attempting to comply with that very statute.  Defendants
additionally argue that plaintiffs lack standing to bring their
Equal Protection claim, or, if they do have standing, the claim
lacks merit because all firefighters were treated the same,
regardless of race, as no one was promoted as a result of the
contested exams.

Plaintiffs counter that a "good faith belief" that
certifying the test results would violate Title VII does not
constitute a defense, as a matter of law, to an allegation of
Title VII or Equal Protection violations against the plaintiffs.

## II.  Standard

Summary judgment is appropriate where "there is no genuine
issue as to any material fact and ... the moving party is

17

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." <u>Heublein, Inc. v. United States</u>, 966 F.2d 1455, 1461 (2d Cir. 1993) (citing <u>Schwabenbauer v. Board of Educ. of Olean</u>, 667 F.2d 305, 313 (2d Cir. 1981)). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." <u>Schwabembauer</u>, 667 F.2d at 314.

## III. Discussion

### A.    Title VII

Plaintiffs argue that defendants' decision and/or advocacy against certifying the exam results amounted to intentional discrimination against plaintiffs, 17 of whom are white and one of whom is Hispanic, in favor of Hispanic and African-American

18

examinees who were favored due to their race and their alleged political support of Mayor DeStefano, via the Rev. Boise Kimber. Plaintiffs essentially argue that defendants' professed desire to comply with Title VII's anti-disparate-impact requirements was in fact a pretext for intentional discrimination against white candidates.  Because plaintiffs allege intentional discrimination, the familiar <u>McDonnell Douglas</u> three-prong burden-shifting test applies.

### 1. Burden-Shifting Framework

Under that framework, plaintiffs first must establish a prima facie case of discrimination on account of race.  <u>See Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000).  To do so, they must prove: (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. <u>See</u>, <u>e.g.</u>, <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973), <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000). "A plaintiff's burden of establishing a prima facie case is de minimis." <u>Abdu-Brisson v. Delta Airlines, Inc.</u>, 239 F.3d 456, 467 (2d Cir. 2001).  Defendants do not dispute the first three prongs of the test, but argue that plaintiffs cannot establish an inference of discrimination because all applicants were treated the same, as nobody was promoted off the examination

19

lists.

Proof of a prima facie case shifts the burden to defendant "to produce evidence that the plaintiff was [terminated] for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing, 530 U.S. 133, 142 (2000) (internal citations, quotations, and alterations omitted). Defendant's burden is satisfied if the proffered evidence "'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).  In this case, defendants proffer a good faith attempt to comply with Title VII as their legitimate nondiscriminatory reason for refusing to certify the exams.

If the employer articulates a neutral reason for the plaintiff's termination, the burden shifts back to the plaintiff to show pretext.  That is, the plaintiff "may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." Reeves, 530 U.S. at 143.

### 2.   Prima Facie Case

Plaintiffs' evidence – and defendants' own arguments – show that the City's reasons for advocating non-certification were

20

related to the racial distribution of the results.  As the
transcripts show, a number of witnesses at the CSB hearings,
including Kimber, mentioned "diversity" as a compelling goal of
the promotional process.  Ude, Marcano, and Burgett specifically
urged the CSB not to certify the results because, given the
number of vacancies at that time, no African-Americans would be
eligible for promotion to either Lieutenant or Captain, and no
Latinos would be eligible for promotion to Captain.  They
believed this to be an undesirable outcome that could subject the
City to Title VII litigation by minority firefighters, and the
City's leadership to political consequences.  Had the tests not
yielded what defendants perceived as racially disparate results,
defendants would not have advocated rejecting the tests, and
plaintiffs would have had an opportunity to be promoted.

A jury could infer that the defendants were motivated by a
concern that too many whites and not enough minorities would be
promoted were the lists to be certified.  Given their minimal
prima facie burden, the Court will assume arguendo that
plaintiffs have proffered sufficient evidence to satisfy the
fourth prong of the prima facie case, given defendants'
acknowledgment that racial concerns, i.e. the disparate impact of
the test results on minority firefighters, provided the impetus
for their actions.

### 3.    Pretext/Discriminatory Intent

Defendants proffer as their legitimate non-discriminatory reason that they desired to comply with the letter and the spirit of Title VII.  Plaintiffs deride this "feigned desire to 'comply' with Title VII," Pl. Mem. of Law [Doc. # 81] at 3, arguing that defendants in fact violated that statute, and their actions were a mere pretext for promoting the interests of African-American firefighters and political supporters of the mayor.

As plaintiffs point out, this case presents the opposite scenario of the usual challenge to an employment or promotional examination, as plaintiffs attack not the use of allegedly racially discriminatory exam results, but defendants' reason for their <u>refusal</u> to use the results.  <u>See</u> Pl. Mem. of Law at 32, 34-35.  Ordinarily, as contemplated by the statute, the "complaining party" bears the burden of proving a disparate impact, and the "respondent" bears the burden of "demonstrat[ing] that the challenged practice is job related for the position in question and consistent with business necessity," or, alternatively, the "complaining party" may prevail by showing that an alternative employment practice with less disparate impact existed and that the respondent failed to utilize it.  <u>See</u> 42 U.S.C. § 2000e-2(k).  Here, the roles of the parties are in essence reversed, with the defendants, normally reflecting a "respondent" role in the Title VII disparate impact analysis, contending that use of the

22

promotional exams, if they had been certified, would have had an adverse impact, and the plaintiffs, normally the "complaining party," arguing that the test results were sufficiently job-related to be defensible under the law.

### a.   Existence of Racially Disparate Impact

Although the parties dispute the exact racial breakdown of candidates passing the Captain's test,[7] plaintiffs do not dispute that the results showed a racially adverse impact on African-American candidates for both the Lieutenant and Captain positions, as judged by the EEOC Guidelines.  Pl. L.R. 56 Stmt. ¶ 246; Def. L.R. 56 Stmt. ¶ 246.  Thus, it is necessarily undisputed that, had minority firefighters challenged the results of the examinations, the City would have been in a position of defending tests that, under applicable Guidelines, presumptively had a disparate racial impact.

Specifically, the EEOC "four-fifths rule" provides that a selection tool that yields "[a] selection rate for any race, sex, or ethnic group which is less than four-fifths (4/5) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact, while a greater than four-fifths rate

---

[7]Plaintiffs assert that 32% of African-American examinees passed the Captain's examination, while defendants assert the figure is 37.5%.  <u>See</u> Marcano Aff., Def. Ex. 4, ¶ 21; Pl. L.R. 56(a) Stmt. ¶¶ 244-47.

will generally not be regarded by Federal enforcement agencies as evidence of adverse impact." 29 C.F.R. § 1607.4(D).

Here, the evidence shows that on the 2003 Lieutenant's exam the pass rate for whites was 60.5%, for African-Americans 31.6% and Hispanics 20%. The four-fifths score would be 48%. In other words, African-Americans had a pass rate that was about half the pass rate for Caucasians, yielding an adverse impact ratio ("AIR") of 0.59, significantly below the AIR of 0.80 that is presumed to not evidence adverse impact under the EEOC Guidelines. See Pl. L.R. 56(a) Stmt. ¶ 246; Def. L.R. 56(a) Stmt. ¶ 246. While the parties dispute the Captain's exam pass rate for African-Americans and Hispanics (see supra note 7), the pass rate for Caucasians was 88%, which is more than double that of minorities and thus by either party's statistic an AIR far below the four-fifths guideline is yielded.

Plaintiffs argue that these AIRs were not appreciably different from those on past promotional exams, and therefore defendants' stated concern with avoiding adverse impact must be pretextual. The parties agree that the AIRs on the 1999 promotional examinations would have failed the four-fifths rule as well. The AIR for African-Americans on the 1999 Lieutenant's exam was 0.58, compared to 0.59 on the 2003 test. See Pl. L.R. 56(a) Stmt. ¶ 246; Def. L.R. 56(a) Stmt. ¶ 246. The 1999 Captain examination had an AIR of 0.45 on African-American test-takers.

24

See Pl. Ex. Vol. I, 40 (1999 scores).

However, it is also undisputed that, because of the Rule of Three, the pass rate is not synonymous with the promotion rate, because only the top three scorers may be considered for each vacant position.  Thus, the rank of the minority applicants is also a key factor.  In 2003, given the number of vacancies, it appeared that at most two Hispanics and no African-Americans would have the opportunity to be promoted to Captain, and no minorities would have the opportunity to be promoted to Lieutenant.  Although the record lacks specification, witnesses at the CSB hearings testified to the effect that in 1999 more minority candidates had scored toward the top of the lists, and therefore had more promotional opportunities.

In any event, in 2003 defendants' concern was with the absence of minority candidates potentially eligible to be promoted, and with the diversity of the Fire Department's management in general.  Thus, the fact that the 1999 exams also had a statistically adverse impact yet were certified, while the 2003 results were not, is insufficient in itself to show that defendants' concerns about complying with Title VII were pretextual.

### b.   Validation Study and Less Discriminatory Alternatives

Plaintiffs additionally argue that defendants' decision was pretextual because they failed to complete a validation study to

test whether the 2003 exams could be defended as adequately job-related.  Going further, plaintiffs argue that defendants were legally <u>required</u> to conduct such a validation study before rendering a decision on certification of the results.

Title VII provides: "Notwithstanding any other provision . . . it shall not be an unlawful employment practice for . . . an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(h).  As plaintiffs concede, this section "provides that professionally developed and properly validated tests are <u>a defense</u> to a claim of disparate impact."  Def. Mem. of Law at 32 (emphasis supplied).  The statute itself does not require employers to implement or continue to use any test simply because it is professionally developed, nor does it provide a defense to an employer who "use[s]" a test with a discriminatory impact where other less-discriminatory, equally effective, alternatives are available.  42 U.S.C. § 2000e-2(h).

Although plaintiffs argue that EEOC guidelines mandated that defendants conduct a validation study before deciding not to certify the exams, the language of the guidelines does not support such a requirement.  A validation study is a method for

26

determining whether a test is sufficiently related to the position for which the test or other criterion is administered. The EEOC's Uniform Guidelines for Employee Selection Procedures create a presumption that "[t]he use of any selection procedure which has an adverse impact on the hiring, promotion, or other employment or membership opportunities of members of any race, sex, or ethnic group will be considered to be discriminatory and inconsistent with these guidelines, unless the procedure has been validated in accordance with these guidelines." 29 C.F.R. § 1607.3(A). The Guidelines further state:

> Where two or more selection procedures are available which serve the user's legitimate interest in efficient and trustworthy workmanship, and which are substantially equally valid for a given purpose, the user should use the procedure which has been demonstrated to have the lesser adverse impact. Accordingly, whenever a validity study is called for by these guidelines, the user should include, as a part of the validity study, an investigation of suitable alternative selection procedures and suitable alternative methods of using the selection procedure which have as little adverse impact as possible, to determine the appropriateness of using or validating them in accord with these guidelines.

Id. at § 1607.3(B).

> . . . Where a selection procedure results in an adverse impact on a race, sex, or ethnic group . . . and that group is a significant factor in the relevant labor market, the user generally should investigate the possible existence of unfairness for that group if it is technically feasible to do so. The greater the severity of the adverse impact on a group, the greater the need to investigate the possible existence of unfairness.

29 C.F.R. § 1607.14(B)(8)(b). The Guidelines provide technical

27

guidance for three types of studies: criterion-related validity studies, content validity studies, and construct validity studies.  See generally 29 C.F.R. § 1607.14.

The Guidelines are written on the assumption that the employer would be defending a certain test and seeking to validate such test in response to a disparate impact challenge from protected group employees.  They do not address the situation in the present case of an employer rejecting a test without conducting a validation study.  Nonetheless, it is evident from the language of the guidelines that a validation study is contemplated as one method by which an employer can defend its use of a test or other selection method it desires to utilize by demonstration that it is sufficiently job-related to pass muster under the statute, despite a racially adverse impact. The guidelines do not require or mandate a validity study where an employer decides against using a certain selection procedure that manifests this impact and plaintiff's argument that defendants violated Title VII by refusing to conduct a validity study before rejecting testing results is thus unpersuasive.

Plaintiffs argue that the CSB did not have extensive evidence of the existence of other, less-discriminatory, and equally-effective selection measures.  Dr. Hornick telephonically testified that other tests, particularly ones he had developed, generally yield less adverse impact, and mentioned that an

28

"assessment center approach" might benefit New Haven, without specifically explaining what that approach entailed.  As plaintiffs argue, there was no testimony that an "assessment center" approach has a demonstrably less adverse impact, and there is some evidence in the record in this case, including from Dr. Hornick's website, that such an approach may still have some adverse impact.  Dr. Hornick acknowledged that he had not had time to review the exams carefully, and his comments illustrated lack of familiarity with the methods IOS utilized to develop the tests.  He suggested that lack of internal review by members of the New Haven Fire Department could have yielded questions that were less relevant to the particular department, but offered no explanation of why such a circumstance would have an adverse impact on minority candidates in particular.  Dr. Helms from Boston College testified that the racial disparity on the exams at issue were not significantly different from the statistical disparities apparent on standardized tests nationwide.  Mr. Lewis, the arson specialist from the Department of Homeland Security, stated that he believed the tests were fair and focused on material that a Lieutenant or Captain should know.

On the other hand, Dr. Hornick and representatives of the black firefighters' union suggested that the 60/40 weighting system for the oral and written examinations could have produced an adverse impact.  The testimony suggested that changing the

29

weighting system yielded increased minority pass rates and diversity in the ranks of Bridgeport firefighters and officers. Dr. Helms suggested that because different employees have different ways of doing the same job, the fact that approximately 2/3 of those interviewed for the JAQ were white could have unintentionally introduced a bias into the test instrument.  She and Mr. Lewis also suggested that differences in the availability of formal training and informal mentoring may have created the disparate effect apparent in the results.

Plaintiffs purport to counter this argument with affidavits emphasizing how much they studied and sacrificed to perform well on the exams, compared to their observations of the efforts of some other examinees, and point to the availability of study groups and informal mentoring in the department.

It appears that the reasons for testing disparities remain elusive.  Dr. Helms testified that many theories exist, but experts on standardized testing nationwide have been unable to satisfactorily fully explain the reasons for the disparity in performance observed on many tests.

Plaintiffs' argument boils down to the assertion that if defendants cannot prove that the disparities on the Lieutenant and Captain exams were due to a particular flaw inherent in those exams, then they should have certified the results because there was no other alternative in place.  Notwithstanding the

shortcomings in the evidence on existing, effective alternatives,
it is not the case that defendants <u>must</u> certify a test where they
cannot pinpoint its deficiency explaining its disparate impact
under the four-fifths rule simply because they have not yet
formulated a better selection method.

### c.   Diversity Rationale

The real crux of plaintiffs' argument is that defendants
refused to explore alternatives or conduct a validity study
because they had already decided that they did not like the
inevitable promotional results if the process continued to its
expected conclusion,[8] and that their "diversity" rationale is
prohibited as reverse discrimination under Title VII.

In <u>Hayden v. County of Nassau</u>, 180 F.3d 42 (2d Cir. 1999),
the Second Circuit held that race-conscious configuration of an
entry-level police department exam did not violate Title VII or
the Equal Protection Clause.  In that case, the Nassau County
Police Department was operating under several consent decrees
prohibiting it from engaging in discrimination in its selection
of police officers, and particularly from utilizing examinations
with disparate impact on minority applicants.  Following
development of a test by the county and Department of Justice

---

[8]Plaintiffs present evidence in the form of emails from the
Mayor's staff suggesting they desired to convince the CSB not to
certify, and further suggesting that if the CSB had certified,
the Mayor would have announced his intention to refuse to forward
the lists to the Fire Department for promotion.

advisors, a validity analysis was conducted to determine which configuration of the test was sufficiently job-related "yet minimized the adverse impact on minority applicants.  Of the twenty-five sections administered to the applicants, the [technical report] recommended that Nassau County use nine sections as the . . . test." Id. at 47.  A class of White and Latino officers challenged use of the adjusted test under Title VII and the Fourteenth Amendment, inter alia, contending that the deliberate design of the test to reduce adverse impact on African-American candidates necessarily discriminated against them on the basis of race.  The Court of Appeals rejected the plaintiffs' contentions, finding plaintiffs were "mistaken in treating racial motive as a synonym for a constitutional violation" and observing that "[e]very antidiscrimination statute aimed at racial discrimination, and every enforcement measure taken under such a statute, reflect a concern with race.  That does not make such enactments or actions unlawful or automatically suspect . . ." Id. at 48-49 (quoting Raso v. Lago, 135 F.3d 11, 16 (1st Cir.)) (internal quotation marks omitted).  The Hayden court further held that the construction of the Nassau County test for the purpose of minimizing adverse impact on minorities was not intentional "reverse discrimination" against whites because the same nine test sections were used for all applicants, so it was "simply not analogous to a quota system or

32

a minority set-aside where candidates, on the basis of their race, are not treated uniformly." Id. at 50.  Rejecting plaintiffs' argument that the design of the test reflected impermissible discriminatory intent, the Second Circuit wrote that "nothing in our jurisprudence precludes the use of race-neutral means to improve racial and gender representation. . . . [T]he intent to remedy the disparate impact of the prior exams is not equivalent to an intent to discriminate against non-minority applicants." Id. at 51.

In Kirkland v. New York State Department of Correctional Services, 771 F.2d 1117 (2d Cir. 1983), the Court of Appeals affirmed the district court's approval of a settlement that determined promotional order based partly on exam results and partly on race-normed adjustments to the exam, after minority employees made a prima facie showing that the test had an adverse impact on minorities.  The Court of Appeals noted that "voluntary compliance is a preferred means of achieving Title VII's goal of eliminating employment discrimination," id. at 1128, and that requiring a full hearing on the test's job-validity before approving a settlement "would seriously undermine Title VII's preference for voluntary compliance and is not warranted," id. at 1130.  Thus, "a showing of a prima facie case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious

33

claim of discrimination to serve as a predicate for a voluntary compromise containing race-conscious remedies." Id. at 1130.

The Second Circuit expanded Kirkland in Bushey v. New York State Civil Service Commission, 733 F.2d 220 (2d Cir. 1984). There, the civil service commission had administered a promotional examination that had a significant adverse impact, with non-minority applicants passing at almost twice the rate of minority applicants. The defendants race-normed the scores for each group, increasing the pass rate of the minority group to the equivalent of the non-minority group, and effectively making an additional 8 minority individuals eligible for promotion, without taking any non-minorities off the list. The Court of Appeals held that the initial results, particularly "the score distributions of minority and nonminority candidates, were sufficient to establish a prima facie showing of adverse impact," id. at 225, and, consistent with Kirkland, "a showing of a prima facie case of employment discrimination through a statistical demonstration of disproportional racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for employer-initiated, voluntary race-conscious remedies," id. at 228. In other words, a prima facie case is one way that a race-conscious remedy is justified, but it is not required: all that is required is "a sufficiently serious claim of discrimination" to warrant such a remedy. Id. at 228; see

34

also id. at 226 n. 7.

In this case, the parties agree that the adverse impact ratios for African-American and Hispanic test-takers on both the Lieutenant and Captain exams were too low to pass muster under the EEOC's "four-fifths rule."  As Kirkland and Bushey held, a statistical showing of discrimination, and particularly a pass rate below the "four-fifths rule," is sufficient to make out a prima facie case of discrimination, and therefore sufficient to justify voluntary race-conscious remedies.[9]  Here, defendants' remedy is "race conscious" at most because their actions reflected their intent not to implement a promotional process based on testing results that had an adverse impact on African-Americans and Hispanics.  The remedy chosen here was decidedly less "race conscious" than the remedies in Kirkland and Bushey,

---

[9]Plaintiffs denigrate reliance on Kirkland and Bushey on the grounds that the "race-norming" procedures utilized in those cases would be unlawful under the 1991 amendments to the Civil Rights Act. See 42 U.S.C. § 2000e-2(l) ("It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin."). See also Hayden, 180 F.3d at 53 (this provision was "intended to prohibit 'race norming' and other methods of using different cut-offs for different races or altering scores based on race.") (emphasis in original).  While plaintiffs are correct that Title VII now prohibits race-norming, none is alleged to have happened here and the 1991 amendments do not affect the reasoning and holding of either case, namely, that a showing of a "sufficiently serious claim of discrimination" is adequate to justify race conscious, remedial measures.

because New Haven did not race-norm the scores, they simply decided to start over, to develop some new assessment mechanism with less disparate impact.  Thus, while the evidence shows that race was taken into account in the decision not to certify the test results, the result was race-neutral: all the test results were discarded, no one was promoted, and firefighters of every race will have to participate in another selection process to be considered for promotion.  Indeed, there is a total absence of any evidence of discriminatory animus towards plaintiffs – under the reasoning of Hayden, 180 F.3d at 51, "nothing in our jurisprudence precludes the use of race-neutral means to improve racial and gender representation. . . .  [T]he intent to remedy the disparate impact of the prior exams is not equivalent to an intent to discriminate against non-minority applicants."[10]

---

[10]Taxman v. Bd. of Educ. of T'wp of Piscataway, 91 F.3d 1547, 1558 (3d Cir. 1996) (en banc), cert. dismissed, 522 U.S. 1010 (1997), relied on by plaintiffs, is readily distinguishable. There, the board of education relied on an affirmative action plan to defend its decision to lay off a white teacher instead of a black teacher with equal seniority, and the Third Circuit held that promoting racial diversity on the faculty, absent a history of past discrimination, was insufficient justification for laying off the white teacher because of her race and violated Title VII. Here, defendants had ample statistical evidence that the tests had an adverse impact on minority candidates and importantly did not opt to select black applicants over white applicants for promotion, but rather decided to select nobody at all.  Williams v. Consol. City of Jacksonville, No. 00cv469, 2002 U.S. Dist. LEXIS 27066 (D. Fla. July 5, 2002), can similarly be distinguished as that case did not concern a decision not to certify test results, but rather a post-certification decision not to create the positions which would result in plaintiffs' promotions because plaintiffs were not African-American.

Plaintiffs contend that Hayden is distinguishable by the fact that the remedy approved there was pursuant to previous consent decrees; they do not explain why they view this distinction as significant.  As Bushey held, it would contravene the remedial purpose of Title VII if an employer were required to await a lawsuit before voluntarily implementing measures with less discriminatory impact.  Bushey, 733 F.2d at 227 (rejecting the plaintiffs' argument that the remedial measures in Kirkland were only permissible as part of a settlement in that case, because that "would create an anomalous situation.  It would require an employer . . . to issue a presumptively discriminatory eligibility list, wait to be sued by minority candidates, and only then seek a settlement....  Such an approach would serve no purpose other than to impede the process of voluntary compliance with Title VII and cause the proliferation of litigation in all such cases. . . .").

Plaintiffs also attempt to distinguish Hayden on the grounds that the challengers to that test, which was constructed from the nine most job-related sections with the least disparate impact, were not injured or disadvantaged, whereas "the instant plaintiffs have been both injured, as they were deprived of promotions, and disadvantaged as they will now be forced to compete once again."  Pl. Mem. of Law at 58.  Plaintiffs take this language from Hayden out of context.  In holding that the

37

<u>Hayden</u> plaintiffs did not prove disparate impact on <u>nonminority</u> applicants, the Court of Appeals held that because "appellants continued to score higher than black candidates, on average, the exam did not impair or disadvantage these appellants in favor of African-American applicants.  Thus, appellants are unable to set forth a claim that they endured any disparate impact as a result of the design and administration of the . . . examination." <u>Hayden</u>, 180 F.3d at 52.  Here, plaintiffs allege disparate treatment, not disparate impact.  Nor do they have a viable claim of disparate impact because the decision to disregard the test results affected all applicants equally, regardless of race – all applicants will have to participate in a new test or selection procedure.[11]

Furthermore, plaintiffs were not "deprived of promotions." As the parties agree, under New Haven's civil service rules, no applicant is entitled to promotion unless and until the CSB certifies the results.  Even then, application of the Rule of Three would give top scorers an <u>opportunity</u> for promotion, depending on the number of vacancies, but no <u>guarantee</u> of

---

[11]While plaintiffs, who describe their considerable efforts to perform well on this infrequently given promotion exam, are understandably disappointed and frustrated that their successful study efforts have come to naught this time, this result is not evidence of being disadvantaged because of their race nor evidence of disparate impact because it does not show injury or disadvantage, only uncertainty as to their performance in the City's next promotion selection process.

promotion; it is even conceivable that the applicant with the
highest score never would be promoted.  See <u>United States v. City</u>
<u>of Chicago</u>, 869 F.2d 1033, 1038 (7th Cir. 1989) (where state law
permitted promotion from among five highest-ranked individuals on
eligibility list, challenger had no property right to promotion:
"a roster ranking may create an expectation of promotion, but an
officer has no entitlement to a particular roster position or to
promotion."); <u>Bridgeport Firebird Society v. City of Bridgeport</u>,
686 F. Supp. 53, 58 ("At best, the provisions of the City Charter
[mandating a Rule of One for promotions] provide the firefighters
ranked on the . . . eligibility list only with a mere expectation
of promotion, which does not rise to the level of a legally
protected interest, especially in the face of 'presumptively
discriminatory employment practices.'") (quoting <u>Kirkland</u>, 711 F.
2d at 1126)).

Thus, while the facts of <u>Hayden</u> were slightly different than
those here, the Court finds the holding quite relevant and
instructive.  Defendants' motivation to avoid making promotions
based on a test with a racially disparate impact, even in a
political context,[12] does not, as a matter of law, constitute

---

[12]Assuming <u>arguendo</u> that political favoritism or motivations
may be shown to have been intertwined with the race concern, that
does not suffice to establish a Title VII violation.  <u>See</u>, <u>e.g.</u>,
<u>EEOC v. Flasher Co., Inc.</u>, 986 F.2d 1312, 1321 (10th Cir. 1992)
(pretext is not shown merely because "some less seemly reason –
personal or political favoritism, a grudge, random conduct, an
error in the administration of neutral rules – actually accounts

discriminatory intent, and therefore such evidence is insufficient for plaintiffs to prevail on their Title VII claim. Accordingly, the Court will grant defendants' motion and deny plaintiffs' motion for summary judgment on this claim.

### B.   Equal Protection Claim

Plaintiffs argue that defendants violated the Equal Protection Clause either by employing a race-based classification system for promotion or, alternatively, by applying facially neutral promotion criteria in a racially discriminatory manner. Defendants counter that they did not employ any racial classifications because every applicant was treated the same when the CSB decided that nobody would be promoted off the lists, and there was no discriminatory intent against whites motivating their non-certification decision.  Additionally, defendants argue that plaintiffs lack standing to bring an Equal Protection claim.

### 1.   Standing

Defendants acknowledge, as they must, that non-minorities have been found to be in a protected group for purposes of standing under the Equal Protection Clause.  See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 210 (1995) (holding that non-minority-owned business' "allegation that it has lost a contract in the past because of a [minority set-aside] subcontractor compensation clause of course entitles it to seek

---

for the decision").

40

damages for the loss of that contract."). However, defendants argue that because plaintiffs have not suffered any harm, and specifically because plaintiffs were not "passed over for a benefit that was given to an allegedly less deserving minority," Def. Reply Mem. at 37, they lack standing.

Defendants confuse standing with the merits of the case. The constitutional injury plaintiffs claim here is not failure to be promoted, but failure to be treated equally on the basis of race. Plaintiffs have standing to bring such a claim. See Comer v. Cisneros, 37 F.3d 775, 791 (2d Cir. 1994) (plaintiff had standing to bring equal protection claim where she alleged that the defendant's Section 8 housing subsidy program "rules and regulations, in their administration, violate the Constitution because they erect a barrier that makes it more difficult for economically disadvantaged blacks to obtain a housing benefit than it was for non-minorities").

### 2.   Racial Classification/Discriminatory Intent

Plaintiffs' Equal Protection claim, however, lacks merit, with respect to both the racial classification and disparate treatment arguments. As the Second Circuit held in Hayden when rejecting plaintiffs' classification argument, if an exam is "administered and scored in an identical fashion for all applicants," there is no racial classification. Hayden, 180 F.3d at 48. Further, a "desire" "to design an entrance exam which

would diminish the adverse impact on black applicants ... does not constitute a 'racial classification.'" Id.  Here, all applicants took the same test, and the result was the same for all because the test results were discarded and nobody was promoted.  This does not amount to a facial classification based on race.[13]  Likewise, where a test is administered and scored in the same manner for all applicants, plaintiffs cannot make out a claim that the exam was a facially neutral test used in a discriminatory manner.  Id. at 50.

Plaintiffs argue that their equal protection rights were violated because they passed the tests and therefore were not similarly-situated to minority applicants who failed.  Plaintiffs argue that if a black employee "shows up for work and works a full day" and a white employee does not, and the black employee

_____

[13]Therefore, plaintiffs' reliance on Berkley v. United States, 287 F.3d 1076 (Fed. Cir. 2002), is unavailing.  In that case, the Air Force employed facially different criteria for selecting women and minority employees for layoff compared to white male employees, and the Federal Circuit held that such a program should be subjected to strict scrutiny (without ruling on the merits).  Likewise, in Dallas Fire Fighters Assoc. v City of Dallas, 150 F.3d 438 (5th Cir. 1998), also relied on by plaintiffs, the city followed an affirmative action plan that specifically called for promoting African-American, Hispanic and female firefighters out of rank, ahead of white and Native American male fighters with higher test scores.  Here, no classification system was employed, as the test results were discarded for every examinee regardless of race.  While defendants clearly were concerned with achieving diversity in the department by enhancing minority promotional opportunity, plaintiffs offer no evidence that defendants employed an actual race-based affirmative action plan that advantaged minority over white applicants for promotion.

complains "that he was due his wages," the employer cannot be heard to defend the complaint on the ground that the employees were treated the same because neither was paid.  Pl. Mem. in Opp. at 64.  Plaintiffs' analogy is faulty because performing well on the exam does not create an entitlement to promotion, whereas working entitles an employee to be paid.  Second, a presumptively flawed test result may not be a proper measure for determining whether anyone should be promoted.

Finally, plaintiffs cannot show that defendants acted out of an intentionally discriminatory purpose.  "Discriminatory purpose 'implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" Id. (quoting Personnel Administrator v. Feeney, 442 U.S. 256, 279 (1979)).  Nothing in the record in this case suggests that the City defendants or CSB acted "because of" discriminatory animus toward plaintiffs or other non-minority applicants for promotion.  Rather, they acted based on the following concerns: that the test had a statistically adverse impact on African-American and Hispanic examinees; that promoting off of this list would undermine their goal of diversity in the Fire Department and would fail to develop managerial role models for aspiring firefighters; that it would subject the City to public criticism; and that it would likely subject the City to Title VII lawsuits

43

from minority applicants that, for political reasons, the City
did not want to defend. "[T]he intent to remedy the disparate
impact of [the tests] is not equivalent to an intent to
discriminate against non-minority applicants." <u>Hayden</u>, 180 F.3d
at 51. None of the defendants' expressed motives could suggest
to a reasonable juror that defendants acted "because of" animus
against non-minority firefighters who took the Lieutenant and
Captain exams.

Accordingly, defendants' motion for summary judgment on this
claim will be granted and plaintiffs' motion will be denied.[14]

### C. Civil Rights Conspiracy

Title 42 U.S.C. § 1985(3) permits recovery of damages if a
plaintiff can prove a conspiracy "for the purpose of depriving,
either directly or indirectly, any person or class of persons of
the equal protection of the laws, or of equal privileges and
immunities under the laws." Because the Court has found that
plaintiffs fail to present sufficient evidence that their equal
protection rights were violated, their § 1985 conspiracy claim
must fail as well. <u>See Mian v. Donaldson, Lufkin & Jenrette
Securities Corp.</u>, 7 F.3d 1085, 1088 (2d Cir. 1993) (evidence of
"racial or perhaps otherwise class-based, invidious
discriminatory animus" required to prevail on § 1985 claim).

---

[14]For this reason the Court need not reach defendants'
arguments that they are entitled to qualified immunity on the
Equal Protection claim.

Accordingly, defendants' motion for summary judgment on this
claim will be granted.

    **D.    First Amendment**

    Defendants additionally move for summary judgment on
plaintiffs' First Amendment freedom-of-association claim, which
motion will also be granted.

    Plaintiffs do not attempt to rebut defendants' contentions
that plaintiffs have not identified a free speech activity in
which they participated nor claimed that any chilling of speech
resulted.  Rather, plaintiffs argue that the CSB's non-
certification decision, and the City defendants' advocacy of that
decision, resulted from political pressure by defendant Kimber,
who threatened the CSB with "political ramifications" if they
voted to certify the results.  Plaintiffs argue that "a jury
could rationally infer that city officials worked behind the
scenes to sabotage the promotional examinations because they knew
that, were the exams certified, the Mayor would incur the wrath
of Kimber and other influential leaders of New Haven's African-
American community."  Pl. Mem. in Opp. at 73.

    While a jury could make such an inference, it would not lead
to the conclusion that plaintiffs' First Amendment right to
freedom of association was violated as a matter of law.  The
evidence shows that Kimber spoke at the first CSB hearing and
strenuously argued against certification, and the City defendants

do not dispute that Kimber is a close political ally of the
Mayor.  However, there is no evidence in the record to suggest
that the non-certification decision was made in retaliation for
plaintiffs' refusal to "associate with," or their expression of
disagreement with, Kimber.  As with the Equal Protection claim,
the fact that defendants desired to avoid the wrath of one group
(in this case African-American firefighters and other political
supporters of Kimber and DeStefano) does not logically lead to
the conclusion that defendants intended to discriminate or
retaliate against plaintiffs because they were not members of
that group.  More importantly, there is no evidence in the record
even to suggest that defendants knew plaintiffs' political
affiliations, i.e., whether they supported Kimber and/or
DeStefano on any issue other than the certification of these
particular exam results.  In sum, in plaintiffs' terms, the
record shows that defendants acted to head off the potential
adverse impact of the promotion tests on African-American and
Hispanic firefighters in order to curry favor with minority
voters and political leaders in the City, but it does not contain
any evidence of an intent or purpose to target plaintiffs for not
supporting that political coalition or its interests.  Thus,
defendants' motion for summary judgment on the First Amendment
claim must be granted.

**E.   Intentional Infliction of Emotional Distress**

Having granted defendants summary judgment on all of plaintiffs' federal claims, the Court declines pursuant to 28 U.S.C. § 1367(c) to exercise supplemental jurisdiction over plaintiffs' state law claim for intentional infliction of emotional distress.  See Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 103 (2d Cir. 1998) ("28 U.S.C. § 1367(c)(3) . . . permits a district court, in its discretion, to decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims.  The Supreme Court, in Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988), announced that when all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice.").

**IV.  Conclusion**

Accordingly, defendants' motion for summary judgment [Doc. # 52] is GRANTED as to the claims under Title VII, the Equal Protection Clause, 42 U.S.C. § 1985, and the First Amendment.  Plaintiffs' cross-motion for summary judgment [Doc. # 60] is DENIED.  The Court declines supplemental jurisdiction over plaintiffs' claim for intentional infliction of emotional

distress.   The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 28th day of September, 2006.**